UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Cause No. 1:21-cr-00099-JMS-TAB |
| | ) |
| JOHNATHAN MARCUM, | ) |
| | ) |
| Defendant. | ) |

**UNITED STATES OF AMERICA'S SENTENCING MEMORANDUM**

The United States respectfully submits this sentencing memorandum to supplement the facts contained in the Information and Presentence Investigation Report and provide additional background regarding the nature and circumstances of the offense and other pertinent factors under 18 U.S.C. § 3553(a). The United States will reserve for the sentencing hearing its views regarding an appropriate sentence.

**I.    Overview**

For approximately four years, the Defendant and his co-conspirators, Dorian LaCourse, and Christopher Petty, engaged in a scheme to acquire machine guns (fully automatic firearms) and re-sell them at a profit. LaCourse was the Chief of Police for the Village of Addyston, Ohio, a small town in southwest Ohio, about ten miles from the Indiana-Ohio line, population approximately 1,000. The Addyston Police Department ("APD") was staffed with between approximately five and ten part-time police officers, with LaCourse being the only full-time officer. The Defendant and Petty were federal firearms licensees ("FFLs"), who each also held a "special occupational tax" stamp, which allowed them to possess machine guns under certain

circumstances. (FFLs with the special tax stamp are referred to as "FFL-SOTs").[1] As discussed below, LaCourse and Petty were each charged in separate causes, have pled guilty, and have each been sentenced to terms of probation and a fine.

The co-conspirators perpetrated their scheme by exploiting exceptions to Congress's general prohibition on the public acquiring machine guns, specifically that (a) law enforcement may acquire them for their official use, and (b) FFL-SOTs may acquire small numbers of them for the purpose of giving demonstrations to prospective law enforcement purchasers. Throughout the scheme, they used LaCourse's status as APD Chief of Police to acquire 208 machine guns of various makes, models, and calibers, including some that are generally used only in a theater of war,[2] by falsely representing to the Bureau of Alcohol Tobacco Firearms and Explosives ("ATF") that the guns would be used by or demonstrated to LaCourse's police department.

In reality, LaCourse never intended APD to purchase or see a demonstration of any machine guns. Indeed, the Village of Addyston had no knowledge of or financial allocation to purchase machine guns—in fact, the Addyston Village Council previously denied LaCourse's request for funds for that purpose. Instead, the Defendant, and to a lesser extent Petty, re-sold over 100 of the machine guns they acquired to other FFL-SOTs at a substantial profit to themselves, a portion of which they shared with LaCourse by writing checks to him personally, which he cashed (a portion of which was found in his desk when ATF searched his office).

---

[1]  MARCUM held a total of four (4) FFL/SOT licenses, one he held personally and the other three are held through his companies, "MARCUM Firearms," "MARCUM MFG (Manufacturing)," and "Police Supply Armory." PETTY held two (2) FFL/SOT licenses through his companies, "Tri-State Guns and Customers Works" and "Tri State Firearms LLC."

[2]  Exhibit 1 to this Memorandum is a photograph showing machine guns seized from the Defendant, including 59 fraudulently obtained during the scheme. Exhibits 2 through 5 depict representative samples of several of the types of machine guns acquired by the Defendant in the scheme. Exhibits 6 and 7 are representative samples of false statements made by the Defendant and his co-conspirators.

## II.     Federal Law Closely Regulates the Possession and Transfer of Machine Guns

Machine guns are "any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger." 26 U.S.C. § 5845(b); *see also* 27 C.F.R. § 479.11. The National Firearms Act ("NFA") has long restricted the ability of American civilians to acquire, possess, or transfer machine guns. The possession of machine guns is governed by federal tax law, under Title 26, rather than under Title 18. Any person wishing to acquire such a weapon is required to pay for a $200 tax stamp from the United States Treasury and must undergo stringent background check requirements. Machine guns are federally registered to their lawful possessors in the National Firearms and Transfer Record ("NFRTR"), a type of tax record, which is administered by the Bureau of Alcohol, Tobacco, Firearms, and Explosive's National Firearms Act Branch ("ATF NFA Branch"). All machine guns not in the possession or control of the United States must be included in the NFRTR. 26 U.S.C. § 5841(a).

In 1986, Congress expanded the NFA's restrictions, passing legislation that prohibited the importation, possession, and transfer of any machine guns manufactured after May 19, 1986 ("post-86 machine guns," which are the weapons that are the subject of this case) to any person or entity other than the United States, except in a few narrowly defined circumstances. Two are relevant here: (1) law enforcement agencies may directly acquire and possess such weapons for law enforcement purposes. 18 U.S.C. § 922(o); 26 U.S.C. § 5844; 27 C.F.R. § 479.105(a); and (2) FFL-SOTs may acquire and possess post-86 machine guns as "samples" to give demonstrations to law enforcement agencies for potential purchase by that agency. 26 U.S.C. § 5844; 27 C.F.R. § 479.105(c)-(d). Regarding samples for demonstration, "[a]pplications to transfer more than one machine gun of a particular model to a dealer must also establish the dealer's need for the quantity of samples sought to be transferred." 27 C.F.R. § 479.105(d). ATF will approve up to two (2)

machine gun samples of a particular model and caliber for possession by, transfer to, and/or importation by a particular registered importer/dealer.[3]

In either case, the law enforcement agency must provide documentation to ATF NFA Branch, or to an FFL-SOT who in turns provides the documentation to ATF NFA Branch, regarding the purchase. ATF NFA Branch plays a key role in enforcing this stringent post-86 machine gun regulatory scheme because it approves or disapproves all requests for post-86 machine gun "transfers," that is, changes in authorized possession from one registered person or entity to another and recorded in the NFRTR. The required documentation states either that the law enforcement agency is the actual purchaser of the machine guns, or that the law enforcement agency has "express[ed] a need for a particular model or interest in seeing a demonstration of a particular weapon." *Id*. The second type of documentation is colloquially called a "demonstration letter" or "law letter."

Such documentation must be truthful. *See, e.g.*, *United States v. Kelerchian*, 937 F.3d 895, 904 (7th Cir. 2019) (identity of purchaser must be "the real buyer or intended recipient of the firearm, not a nominal or straw buyer."). Knowingly submitting false information is a crime. *See* 18 U.S.C. §§ 924(a)(1)(A), 922(g)(6), 1001; 26 U.S.C. § 5861(l).

Notably, regarding demonstrations, if the law enforcement agency decides not to purchase the demonstrated machine gun, the law allows the FFL-SOT to: (1) maintain possession of the machine gun for as long as the proper license is held; (2) transfer the machine gun directly to another law enforcement agency; or (3) transfer it to another qualified FFL-SOT, who in turn, prior to ATF NFA Branch approving the transfer, must produce a valid demonstration letter justifying it.

---

[3] *See* ATF Ruling 2002-5, available at https://www.atf.gov/file/57786/download

The comprehensive regulatory scheme overseen by the ATF necessarily relies on the scrupulous compliance and good faith of both law enforcement agencies and FFL-SOTs. Nothing in the relevant governing federal statutes or implementing regulations places limits on the types of machine guns that interested law enforcement agencies may purchase, or that FFL-SOTs may correspondingly acquire for purposes of demonstration to those agencies, except as noted that FFL-SOTs typically may acquire no more than two demonstration samples per license. *See* 27 C.F.R. § 479.105(d). The truthfulness of a law enforcement agency's demonstration letter, therefore, is of crucial importance to the proper administration of the laws regulating machine gun possession. And ATF NFA Branch, relying on the representations of law enforcement agencies contained in such letters, is responsible for acting on these transfer requests. Except under circumstances not relevant to this case, without ATF NFA Branch's approval, an FFL-SOT cannot lawfully take possession of the requested machine guns listed in a demonstration letter.

The NFA's statutory restrictions on machine gun ownership have created a valuable collector's market for machine guns in the United States. With respect to civilian-transferable machine guns manufactured or imported prior to 1986 (a commodity that, by definition, will never increase in quantity), such weapons routinely can sell for tens of thousands of dollars apiece on the collector market, depending on the type of machine gun and condition.

Even post-86 machine guns (like the weapons at issue in this case) can have significant monetary value to FFL-SOTs. Because of the stringent and narrow circumstances under which an FFL-SOT may lawfully possess such weapons, some FFL-SOTs are willing to pay a premium to acquire certain post-86 machine guns that are not easily acquired by FFL-SOTs. Understandably so: it is not every law enforcement agency that will express to the ATF a bona fide interest in receiving a demonstration of, for example, belt-fed M2 .50 caliber heavy machine guns or M249 5.56mm Squad Automatic Weapons for potential purchase and use. (*See* Exhibits

3 and 4 for photographs of these types of weapons.) Such machine guns are in the most literal sense weapons of war, as described in the Information (paragraph 32). The resulting limited availability of certain post-86 machine guns like these for acquisition by FFL-SOTs can generate significant demand for those guns. Indeed, the Defendant charged another FFL-SOT approximately $22,000 for a belt-fed M2 .50 caliber machine gun that he acquired by means of a fraudulent law letter.

### III. The Scheme to Acquire and Re-Sell Machine Guns

The co-conspirators' scheme exploited this demand, which netted the Defendant hundreds of thousands of dollars for the resale of over 100 machine guns. The scheme was devised to, and did, circumvent the ATF's comprehensive regulatory oversight over the transfer and possession of post-86 machine guns.

As recounted in the Information, the scheme was multifaceted. One facet related to the dozens of false "demonstration letters" that the Defendant drafted and LaCourse signed, which were submitted to ATF to effect transfers of machine guns to the Defendant and Petty for ultimate re-sale. The letters purported to be APD requests to receive demonstrations of these weapons for possible purchase by the department. But no such departmental purchase of any of the machine guns was ever intended, despite what was stated in those letters. The intent, rather, was to permit the Defendant and, to a lesser extent, Petty, to acquire and market these machine guns for resale to other FFL-SOTs. The Defendant held multiple FFL-SOT licenses, permitting him to acquire and possess more than two "sample" machine guns of any specific type, per license, thus increasing the number of machine guns of business inventory he could offer for resale at any given time. The false demonstration letters caused NFA Branch to authorize the transfer of 178 machine guns to the Defendant, many of which he re-sold for profit.

Another facet of the Defendant's scheme was the illegal acquisition of machine guns ostensibly by APD itself. A number of these were from German weapon manufacturer Heckler & Koch ("H&K"). As detailed in the Information, the Defendant and LaCourse conspired to falsify purchase and importation papers that concealed that the actual purchaser of the 18 H&K machine guns outlined in the Information was the Defendant (who paid the full purchase price for the guns) and not APD—a classic straw purchase. Further, these false statements also caused H&K unwittingly to violate German laws permitting the export of machine guns only to military or law enforcement customers (and not to an FFL-SOT like the Defendant, or to any other civilian purchaser). This even more stringent restriction for German-manufactured machine guns further increased the value of the ones the co-conspirators obtained.

### IV.   ATF's Discovery of the Scheme and the Coconspirators' Continued Concealment

In 2018, ATF NFA Branch became suspicious of requests for machine gun transfers relating to APD, in particular the quantity of guns requested for demonstration. ATF NFA Branch contacted LaCourse directly via email. Emails obtained during the investigation showed that LaCourse reached out to the Defendant for direction, and the Defendant helped LaCourse draft a response that purported to justify the need for the quantity of machine gun transfer requests. The purported, but false, justification was that the weapons allegedly being demonstrated (they were not) overheated during testing, and therefore multiple sales samples were necessary to allow APD officers efficiently to test the weapons. LaCourse sent the response to ATF NFA Branch.

Several months later, ATF NFA Branch inquired regarding the number and type of weapons being requested. LaCourse, again with the Defendant's assistance, responded deceptively, stating that he requested a variety of weapons to ensure APD officers would be familiar with such weapons in the event they encountered them "in the field." As LaCourse and the Defendant knew, of course, the chances that any of APD's handful of part-time officers would

encounter such weapons during the course of their duties was infinitesimal. Moreover, when asked, the mayor of the Village of Addyston told ATF NFA Branch the truth: the village had neither budgeted nor approved the purchase of any machine guns.

Because of the conflicting explanations received from the co-conspirators, lingering questions about the propriety of the demonstration letters in question, and the large numbers of machine guns requested in demonstration letters from the small police department in Addyston, ATF NFA Branch denied a number of the requested transfers to the Defendant. ATF NFA Branch further referred the matter for criminal investigation in early 2019. Despite the ATF's scrutiny of their actions, however, the Defendant and LaCourse continued to draft and submit fraudulent law letters to the ATF until confronted by agents in spring of 2019. Even then, when ATF investigators interviewed LaCourse as part of their investigation, he repeated the story he and the Defendant had concocted for ATF NFA Branch about wanting APD officers to be familiar with machine guns if they find them. And then, LaCourse called the Defendant to tip off the Defendant to ATF's investigation and presence in the area that day.

### V. ATF's Seizure and Tracing of Machine Guns Acquired as Part of the Scheme

As part of its investigation, ATF took significant steps to ascertain the location of the 208 machine guns acquired through the above-described scheme. Through seizures and voluntary relinquishments by the Defendant and his co-conspirators, ATF has physical custody of a significant portion of the 208 firearms. Regarding the remaining firearms, ATF traced each of them to a licensed FFL-SOT who acquired the firearms from the Defendant or Petty. By the end of this process, the ATF had accounted for all of the 208 machine guns acquired as part of this scheme.

## VI. Charging and Sentencing of Co-Defendants

LaCourse and Petty were also federally charged for their role in this offense. LaCourse was charged by indictment in *United States v. Dorian LaCourse*, No. 1:20-cr-342-SEB-MJD (S.D. Ind.), and Petty was charged by information in *United States v. Christopher Petty*, 1:21-cr-100-SEB-TAB. The allegations in those charging instruments mirror the allegations in the Defendant's (Marcum's) case, which Count 1 of each alleging a conspiracy to commit the machine gun scheme described above in violation of 18 U.S.C. § 371.[4]

Like the Defendant, both LaCourse and Petty agreed to plead guilty to Count 1 of their respective charges. At this point, both LaCourse and Petty have entered their respective pleas in open court, been adjudged guilty, and sentenced. *See LaCourse*, No. 1:20-cr-342, ECF No. 46; *Petty*, 1:21-cr-100, ECF No. 39. LaCourse was sentenced to three years' probation and a fine of $11,600. *LaCourse*, ECF No. 49. Petty was sentenced to two years' probation and a fine of $9,000. *Petty*, ECF No. 40.

                                                          Respectfully submitted,

                                                          ZACHARY A. MYERS
                                                          United States Attorney

                    By:    *s/ James M. Warden*
                             James M. Warden
                             Assistant United States Attorney

                    By:    *s/ William L. McCoskey*
                             William L. McCoskey
                             Assistant United States Attorney

---

[4] When the charges for both the Defendant (Marcum) and Petty were filed, notations were made on each Clerk's Criminal Information Sheet that each case was related to the first-filed *U.S. v. LaCourse*. *See* ECF No. 4. However, the United States inadvertently failed to file a separate motion for re-assignment based on related cases pursuant to S.D. Ind. Local Criminal Rule 12.2(b).

## CERTIFICATE OF SERVICE

I hereby certify that on June 29, 2022, a copy of the foregoing Sentencing Memorandum was filed electronically. Notice of this filing will be sent to all ECF-registered counsel of record via email generated by the Court's ECF system. Parties may access this filing through the Court's system.

By: *s/ James M. Warden*
James M. Warden
Assistant United States Attorney